Leander P. Bomholt v. Commissioner. Otto M. Bomholt v. Commissioner.
Bomholt v. Commissioner
Docket Nos. 18720, 18721.
United States Tax Court
1950 Tax Ct. Memo LEXIS 104; 9 T.C.M. (CCH) 754; T.C.M. (RIA) 50220; September 8, 1950
*104 Petitioners are brothers and during the taxable years 1938 through 1945, were the sole and equal partners in a farm implement business. During each of these years partnership returns were filed and individual returns were filed for the years in which petitioners determined a tax to be owing. Inadequate business records, plus an ignorance of accounting methods, resulted in the understatement of partnership income for each of these years. The partnership income was determined by petitioner Otto M. Bomholt and was largely based on estimates. The partnership received negotiable promissory notes for a great portion of its sales and a part of the assets of the business on January 1, 1938, was represented by these notes. In 1946, the personal animosities between petitioners reached a culmination and the partnership was dissolved. A physical inventory was taken at this time (the first since 1937) and the result of this inventory led petitioners to conclude that they had not reported all of their earnings from 1938 to 1945, inclusive. Upon advice sought of officials of International Harvester Company, petitioners employed an accounting firm to reconstruct partnership and individual income *105 for the years 1938 through 1945, and to file the necessary returns which would rectify their past errors. Amended and delinquent returns were filed and petitioners paid all taxes, interest and penalties on the basis of the amended and delinquent returns. This action of petitioners was entirely voluntary and done before any investigation by respondent. Held: (1) Respondent erred in determining that a part or all of the deficiencies were due to fraud and fraud penalties are not sustained. Petitioners are, therefore, entitled to the benefit of section 6 of the Current Tax Payment Act of 1943. (2) Respondent is not barred from asserting a deficiency for the year 1941. Petitioners executed waivers in accordance with the provisions of the Internal Revenue Code. (3) Respondent erred in determining the partnership net income on the basis of the bank deposit method. Held. further, petitioners' method of reconstructing income using a percentage markup of cost of goods sold is sustained with necessary adjustments to income in order to reflect the receipt of interest. (4) Respondent did not err in determining the opening net worth of the partnership and of the petitioners individually; *106 however, respondent did err in determining the closing net worth of the partnership. Held, further, petitioners' determination of the closing net worth of the partnership is sustained. Held, further, the unexplained increase in net worth after making proper adjustment for interest income is properly allocable to each of the eight years equally. Ralph S. Boggs, Esq., and Nolan Boggs, Esq., or the petitioners. Lawrence R. Bloomenthal, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion In these consolidated *107 proceedings the Commissioner determined income tax deficiencies, delinquency penalties and civil fraud penalties for the calendar years ended December 31, 1938 to December 31, 1945, inclusive, as follows: Leander P. Bomholt - Docket No. 18720
Delinquency
Fraud
Year
Kind of Tax
Deficiency
Penalty
Penalty
1938
Income
$ 897.67
$ 0
$ 448.83
1939
Income
770.11
192.53
385.06
1940
Income
475.89
118.97
237.94
1941
Income
5,266.49
0
2,633.24
1942
Income
28,569.45
0
14,284.72
1943
Income
5,066.48
0
2,476.08
1944
Income
34,934.88
0
17,467.44
1945
Income
6,481.81
0
3,240.90
Totals:
$82,462.78
$311.50
$41,174.21
Otto M. Bomholt - Docket No. 18721
1938
Income
$ 553.11
$138.28
$ 276.56
1939
Income
421.18
105.29
210.59
1940
Income
167.86
41.96
83.93
1941
Income
4,593.32
0
2,296.66
1942
Income
27,958.25
0
13,979.12
1943
Income
4,456.75
0
2,214.30
1944
Income
34,786.69
0
17,393.34
1945
Income
5,849.53
0
2,924.76
Totals:
$78,786.69
$285.53
$39,379.26
The deficiencies result from numerous adjustments to petitioners' net incomes as disclosed by their original returns *108 and from respondent's determinations of income for the years in which no returns were filed. To respondent's determinations petitioner Leander P. Bomholt assigns errors as follows: (1) The Commissioner erred in asserting the penalty provided by Section 293(b) Internal Revenue Code against petitioner for each and every year 1938-1945, both inclusive. (2) The Commissioner erred in increasing petitioner's net income in the amount of $4,211.79 in each and every year 1938-1945, both inclusive, based upon claimed increases in net worth. (3) The Commissioner erred in asserting a deficiency against petitioner in the years 1938 and 1941, the statute of limitations having run on these years. (4) The Commissioner erred in not allowing petitioner the benefit of Section 6 of the Current Tax Payment Act of 1943, the so-called "forgiveness provision" in computing petitioner's tax for the years 1942 and 1943. (5) The Commissioner erred in his allocation of the partnership income and petitioner's share thereof between the years from 1938 through 1945, both inclusive. Petitioner Otto M. Bomholt assigns errors as follows: 1. The Commissioner erred in asserting the *109 penalty provided by Section 293(b) Internal Revenue Code against petitioner for each and every year 1938 to 1945, inclusive. 2. The Commissioner erred in increasing petitioner's net income in the amount of $2,172.92 in each and every year 1938 to 1945, both inclusive, based upon claimed increases in net worth. 3. The Commissioner erred in asserting a deficiency against petitioner in the calendar year 1941, the statute of limitations having run on this year. 4. The Commissioner erred in not allowing petitioner the benefit of Section 6 of the Current Tax Payment Act of 1943, the so-called "forgiveness provision" in computing petitioner's tax for the years 1942 and 1943. 5. The Commissioner erred in his allocation of the partnership income and petitioner's share thereof between the years from 1938 through 1945, both inclusive. The issues for our decision are as follows: 1. Whether respondent erred in determining that any part or all of the deficiencies for the years 1938 through 1945 were due to fraud. 2. Whether respondent erred in determining that petitioners were not entitled to the benefit of section 6 of the Current Tax Payment Act of 1943. *110 3. Whether, in the absence of fraud, the statute of limitations has barred the assessment of deficiencies for the years 1938 and 1941 as to Leander Bomholt and for the year 1941 as to Otto Bomholt. 4. Whether respondent erred in his determination of the partnership and individual incomes for the years 1938 through 1945. Findings of Fact The facts which were stipulated are so found and are incorporated herein by reference. Other facts are found from the evidence. During the taxable years herein (1938 to 1945, inclusive) petitioner Leander P. Bomholt was an equal partner with his brother, petitioner Otto M. Bomholt, in a farm equipment business known as Frank Bomholt & Sons with store at Celina and St. Rosa, Ohio. The business of Frank Bomholt & Sons was founded in 1886 by Frank Bomholt, petitioners' father, and since 1900 International Harvester Company equipment has been sold by Frank Bomholt and successor organizations. Otto M. Bomholt (hereinafter referred to as Otto) was born in St. Rosa, Ohio, in 1900. Otto attended the rural country grade school at St. Rosa through the eighth grade and then went to a boarding school, St. Joseph's College at Rensselaer, Indiana, where *111 he took a three-year commercial course, including typewriting, algebra and bookkeeping. After leaving school Otto worked at various jobs, including clerking in a hardware store. He also took a mechanical course at the Cleveland Automotive School and later worked as a mechanic in Celina, Ohio. Otto joined his father in business in 1918. Leander P. Bomholt (hereinafter called Leander) was born in St. Rosa, Ohio, in 1902, attended the rural schools there through the seventh grade and was then sent to St. Joseph's College at Rensselaer, Indiana, for one year where he finished the eighth grade. Leander left school at the age of 16 and began working for farmers. Later, he was employed in a garage at Celina, Ohio, for about one year and then learned the trade of an automobile mechanic. On October 15, 1923, petitioners entered into a partnership agreement with their father which provided that each should be a one-third partner and that each partner should draw $7.00 per week for necessities and the remainder of the earnings was to be left in the business. Otto was delegated to handle the books of the partnership by reason of his somewhat better education. The business became known as Frank *112 Bomholt & Sons. During the existence of this three-way partnership, each partner made additional drawings at the end of the year to balance his account. In the early 1930's, at the urging of the International Harvester Company, petitioners and their father opened another store in Celina, Ohio, about 12 miles from St. Rosa. Otto remained in charge of the St. Rosa store and Leander was in sole charge of the Celina store until the partnership was dissolved in 1946. The Celina store became the larger of the two places operated during the years 1938 to 1945, inclusive. In 1935, Frank Bomholt withdrew from the business. Otto and Leander purchased their father's interest and continued the business as equal partners. The copartnership agreement between Otto and Leander executed in 1935 provided that each partner was to draw $10 per week for personal expenses. Prior to 1939, each store maintained a separate bound ledger of about 500 pages similar to the one Frank Bomholt had used in the earlier years, and until 1939, Leander attended to the bookkeeping in Celina, while Otto kept the books at St. Rosa. The separate bound ledgers maintained at each store prior to 1939 recorded only sales *113 on open account and sales for which notes receivable were furnished by the customer. Each store also maintained a sales register containing loose-leaf slips, one of which would be filled in for each credit sale. The information shown on the sales slip then was posted to the ledger account for the particular customer. In 1939, by reason of the growth of the business, one Roman Vonder Haar was employed to take care of the books of the partnership. At his suggestion the two separate books, one for each store previously maintained, were consolidated and all books and records were kept at the Celina store. A record of the notes receivable was kept in a loose-leaf ledger rather than a mere listing of them as was done in the years before. This latter method was used continuously from 1939 to the dissolution of the partnership in 1946. Cash received as payments on notes would be entered on a sales slip showing the name of the customer and the details of the payment. Such slips were made out by Otto, Leander or whichever of the employees happened to handle the transaction. The payment so recorded then would be posted to the customers' ledger accounts by the bookkeeper. After cash receipts *114 were posted from the sales slips to the customers' ledger accounts, the sales slips were placed in cardboard boxes which were the only files available. Throughout the taxable years 1939 to 1945, inclusive, all deposits to the bank accounts of the partnership were handled by the bookkeeper. After 1939, cash sales of parts or equipment were recorded on sales slips but not posted to the accounts of the individual customers in the loose-leaf ledger since that record was used only for entering sales on credit and for recording the receipt of notes. Leander was in charge of the parts and repair end of the business. He ordered, sorted and kept track of the repairs and replacement parts for the machinery they sold. In this connection he handled 10.000 to 13,000 different kinds of parts, totaling more than 100,000 units in all. In addition to this work he also handled sales and collections at the Celina store. Otto was in charge of the financial affairs of the entire partnership business. He ordered all machinery sold by either store and exercised general supervision over the bookkeeping system. The total cost of parts purchased during each year was shown by cancelled checks, check stubs *115 and paid invoices. All bills for merchandise and other expenses were paid by checks drawn on the partnership bank account. During the years involved the partnership maintained two commercial or checking accounts, one with the St. Henry's Bank at St. Henry, Ohio, and the other with the Commercial Bank in Celina, Ohio. From 1938 to 1943, the partnership was forced to continually borrow funds with which to operate. They were continually indebted in large amounts to the local banks as a result of this borrowing. This indebtedness was incurred to give them money with which to purchase the merchandise they sold. During all the years of its operation a great amount of the farm equipment purchased by farmers was paid for by the negotiable promissory notes of the purchasers. The majority of these farmers' notes was paid off from two to four years after they were taken in payment of a completed sale. The loans made by the local banks to the partnership were secured by the collateral pledging of these farmers' notes. These notes were accepted at the full value of the balance due thereon by the banks and were pledged by the partnership to the banks on a two for one basis, i.e., notes totaling *116 twice the amount of the loan were pledged to secure the loan. Assistance was secured from Mark Boeckman, a deputy collector of internal revenue stationed at Celina, Ohio, when Otto made out the partnership returns for the calendar year 1938. Otto brought the figures to Boeckman who filled out the necessary forms and presented them to Otto and Leander for signature. For each and every year 1938 through 1945, both inclusive, partnership information returns were filed with the collector of internal revenue for the 10th district of Ohio at Toledo, Ohio; all of these returns were signed on behalf of the partnership by Otto and were prepared on the cash basis. Petitioner Leander P. Bomholt duly filed personal income tax returns for every year 1938 through 1945, inclusive, except the years 1939 and 1940. For the years in which Leander filed returns he reported his share of the partnership income as reflected by the partnership information returns filed for those years. No returns were filed in 1939 and 1940 because Leander determined no tax to be owing. Petitioner Otto M. Bomholt duly filed personal income tax returns for every year 1938 through 1945, inclusive, except the years 1938, *117 1939 and 1940. For the years in which Otto filed returns he reported thereon his share of the partnership income as reflected by the partnership information returns filed for those years. No returns were filed in 1938, 1939 and 1940 because Otto determined no tax to be owing. Operating expenses of the business of Frank Bomholt & Sons as reported in the original partnership information returns filed for the years 1938 to 1945, inclusive, were compiled by Otto from check stubs and from information supplied by the bookkeeper. After the original partnership information return for each year was prepared, Otto gave Leander the figure representing his share of the partnership net income as reflected in said returns and Leander reported that amount as taxable income in the returns he filed during 1938 to 1945, inclusive. Otto prepared and signed the financial statements submitted by the partnership to banks in Celina and St. Henry. These statements were not accurate because Otto was attempting to give as rosy a picture as he could. No record was maintained by the partnership showing the amounts, if any, owing to the individual partners for repayments of funds borrowed from the partners *118 for use in the business. No control account was maintained by the partners showing a running total of disbursements but the bookkeeper carefully preserved all paid bills which, together with check stubs and cancelled checks, made available at the end of each year the data necessary for compiling a complete record of disbursements, except as to certain cash withdrawals by the partners which were not recorded in any of the firm's books. During the years 1944 and 1945, the partners withdrew cash from the register drawers before bank deposits were made up. These withdrawals were in addition to the amounts withdrawn by checks issued to the partners. Otto knew during the years 1938 to 1945, inclusive, that he and his brother drew larger amounts out of the business than either of them reported in their income tax returns. The amount withdrawn in excess of the sums actually reported for income tax purposes was felt to be money belonging to the partners which they had not been able to withdraw in earlier years because the large volume of notes receivable carried for their customers had forced them to borrow heavily from the banks. Otto never made any calculations during the taxable years *119 involved herein to ascertain exactly how much of the money withdrawn in excess of the sums he reported as taxable income represented earnings prior to 1938, and how much represented current earnings. Otto has no record showing the amounts of cash, if any, which he or his brother Leander returned to the farm during the years 1938 to 1945, either as loans or additional capital, nor does he have any independent recollection of the details of such transactions. Leander knew the exact amount he was withdrawing each year during the period 1938 to 1945, inclusive, but he never inquired of the deputy collector of internal revenue stationed in Celina or any other source whether all of this money had to be reported as taxable income. In the course of their dealings with the International Harvester Company, Otto M. Bomholt and Leander P. Bomholt, d.b.a. Frank Bomholt & Sons, were required to and did submit a number of financial statements to the company's office at Ft. Wayne, Indiana, using a printed form provided for that purpose. These statements were not accurate as they were based on estimates. Otto was unable to explain the discrepancies between the inventory figure of $27,850 reported *120 to the International Harvester Company in the financial statement dated November 20, 1940, and the closing inventory figure of $3,741.25 shown in the cost of goods sold section of the partnership information return of Frank Bomholt & Sons for the year ended December 31, 1940. When the financial statement of Frank Bomholt & Sons dated August 3, 1943, was received in the Ft. Wayne office of the Harvester Company it was reviewed by the credit manager. Upon comparison with the statement submitted under date of July 15, 1942, he noticed the figures in both statements were exactly the same. After making a personal call on the Bomholts on Tuesday, August 10, 1943, he wrote them requesting a corrected statement. Pursuant to this request Otto submitted a revised statement dated September 25, 1943. The financial information disclosed in the statements to International Harvester Company was obtained partly from the books and partly from his own estimates. Otto did not take the figures shown in the Harvester Company statements for inventory, notes receivable, or notes and accounts payable, from the books because it was too complicated for him to obtain accurate information. These two brothers, *121 the petitioners, got along very badly for many years. While the father was in business with them he served to moderate their differences, but after he retired from the business the arguments and bad feeling increased between them. This was evidenced by the fact that in 1938 Otto served a notice on Leander of his intention to dissolve the partnership. In 1939, Otto filed suit to dissolve the partnership in the Common Pleas Court of Mercer County, Ohio. This suit was subsequently dismissed by Otto. This friction between the two brothers was primarily the result of differences over business methods and business policy, Otto favoring rapid expansion and a big business at any cost and Leander favoring going along slowly, expanding less rapidly, not so much borrowing, and a sounder financial picture. In addition Otto's wife during this entire period, 1938 through 1945, was very ill. Her condition necessitated a great deal of medical and hospital attention, both in Celina and in other cities. This resulted in a norvous strain and tension on Otto. Petitioners were tireless workers and both devoted long hours to their respective stores. The personal feeling between the petitioners was *122 so great that on several occasions physical combat resulted from their heated arguments. At no time did their own employees know them to agree and all conversations between them resulted in arguments. In view of this, to communicate one with the other, these two brothers resorted to writing notes to each other on business matters. These notes were delivered back and forth by the delivery man between the two stores. This was the only way the one partner could be certain he could convey his idea to the other. In the latter part of 1946, the petitioners finally agreed to dissolve the partnership and an inventory was taken of equipment, machinery and other assets owned by the firm. While a physical inventory was being taken, the firm's business shut down for a week and it was approximately one month before the cost of inventory on hand was finally computed from the old invoices. This 1946 inventory disclosed that the partnership was worth more than either partner realized. This indicated to them that their previous income tax returns were in error, and, not knowing what to do, they sought the advice and counsel of officials of the International Harvester Company at Ft. Wayne. The officials *123 of that company suggested that they employ an accounting firm which petitioners did. The firm employed was Mefford and Perry of Crawfordsville, Indiana. Two members of the accounting firm met with petitioners in Celina to discuss their problem. At this meeting the accountants were authorized to audit the books and records of the partnership and determine whether or not the previous partnership income tax returns were in error. They were instructed that if these returns were found to be in error, they should take all steps necessary to correct them, as well as the partners' individual income tax returns. They were further instructed that they would not be interfered with in their work, they were to be given a free rein, and upon notification by them of any amount of tax owed by the partners, the same would be paid without argument. The accountants examined the books and records of the partnership and determined that these books and records were not adequate to reflect the true financial status of the partnership. Their examination disclosed that the most accurate records kept by the partnership were those relating to payments made by the partnership for merchandise and parts purchased *124 for sale. These payments were reflected by cancelled checks, check stubs and paid invoices. Their examination further disclosed that in each year the partnership made a great many sales for which negotiable promissory notes were received in payment. In view of these facts, these accountants reconstructed the partnership income for the period involved upon a markup of cost of sales or gross profit percentage method. The method of reconstruction of the taxpayers' accountants was to establish from the cancelled checks, check stubs and paid invoices, the total purchases made by the partnership in a given year. In their reconstruction work they went back to the year 1938 as a starting point, this being the year of the last accurate inventory before the inventory of 1946. They then established the total increase in inventory between this date and December 31, 1945. In this connection it was necessary that the 1946 inventory be adjusted as of December 31, 1945. The total increase between these two inventory dates they allocated in equal amounts to each of the intervening eight years to establish the intervening closing and opening inventories. Having then an opening and closing inventory *125 for each calendar year, plus the purchases in the same year, they then established cost of goods sold in that year to which they added a markup of 33 1/3 per cent as the partnership profit to get the gross sales figure for each year. This gross sales figure was then used by them in computing the partnership profit for that year. In connection withthe computation of the partnership net income for a given year, these accountants used such expense figures as could be substantiated by the available cancelled checks and check stubs. The resulting partnership net profit they allocated equally to each of the partners, Leander and Otto. The 33 1/3 percentage markup employed by these accountants was based on their knowledge and experience from working among other farm implement dealers. This markup was high for this type of business, the average markup being 28 to 30 per cent. A high markup was purposely used by these accountants so that they would not be short on income in their reconstruction. For certain periods during the years here involved the accountants were unable to locate the cancelled checks or check stubs. For these short periods they established purchases during these periods *126 by verifying the recorded bank disbursements with paid invoices. It was the policy of these accountants in doing their work to treat as an expenditure for purchases all doubtful items of expenditure by the partnership. The result of this practice increased purchases, which in turn increased the cost of goods sold, which in turn increased the partnership income, by reason of the fact that such expenditures were also marked up 33 1/3 per cent to arrive at gross sales. A list of balances in the notes receivable account was compiled by McCarthy, one of the accountants for Mefford and Perry who was put on thejob for the accounting firm, but it does not accurately reflect the outstanding notes receivable held by the partnership on December 31, 1937 and December 31, 1938, because it was based on incomplete records. A balance sheet for Frank BomHolt & Sons as of December 31, 1937, was prepared by McCarthy showing a net worth of $157,305.87, computed as follows: Cash: St. Henry Bank
$ 187.23
Commercial Bank
2,222.30
$ 2,409.53
Notes Receivable
116,921.53
Inventory
2,968.15
Fixed Assets
35,006.66
Total Assets
$157,305.87
Liabilities
0,lNet worth
157,305.87
Total liabilities and net worth
$157,305.87
*127 The foregoing balance sheet included customers' notes receivable in the amount of $116,921.53 as an asset, but did not list any liabilities for bank loans or for merchandise accounts and notes payable. McCarthy claimed that accounts and notes payable were not included because that would have increased the value of the inventory but he did not know whether all inventory on hand had been paid for as of December 31, 1937, either in cash or by notes. McCarthy did not ascertain what liabilities, if any, were outstanding as of December 31, 1937, for bank loans or for accrued items of business expense, the inclusion of which in the balance sheet would not have affected the value of theinventory. McCarthy did not know that the petitioners had reported a net worth for their business of $122,437.57 to the International Harvester Company on November 20, 1940; likewise McCarthy could not explain the discrepancy between the amount of notes receivable on hand reported to the International Harvester Company under date of November 20, 1940, $125,767.17 and the amount of $28,672.08 which he showed as the balance in the customers' notes receivable account as of December 31, 1940, in a schedule prepared *128 for petitioners' counsel as the basis for inclusion of notes receivable in the December 31, 1937, balance sheet of the partnership. McCarthy could not explain the discrepancies between the balance of $40,680.65 shown in his own analysis of the notes receivable account as of December 31, 1943, and the balance of $50,326.97 shown in the financial statement submitted by Frank Bomholt & Sons to the International Harvester Company on September 25, 1943. McCarthy was not certain that the bank accounts of the partnership reflected all cash received on sales or collection of notes or that such accounts recorded all withdrawals. The amended returns filed in 1946 for the partnership were shown on their face to be prepared on the accrual basis but this was a typographical error and they were intended to be filed on a cash basis because they were prepared on a cash basis. Petitioner Leander P. Bomholt on or about October 15, 1946, filed with the collector of internal revenue at Indianapolis, Indiana, amended personal income tax returns for each of the years 1938, 1941 through 1945, both inclusive, as well as delinquent returns for the years 1939 and 1940, for which years no returns had previously *129 been filed. These returns were prepared by the accounting firm of Mefford and Perry, Crawfordsville, Indiana, accountants employed by the petitioner in 1946. At the time the returns were filed petitioner paid to the collector of internal revenue the sum of $52,995.04 in payment of the tax liability disclosed by these returns, including interest and penalties for the years when no returns were filed. This action taken by the taxpayer was entirely voluntary and occurred prior to the time any investigation, notification or demand was made upon the taxpayer by the United States Treasury Department, Bureau of Internal Revenue, or any agent or representative of these departments. Petitioner Otto M. Bomholt on October 15, 1946, filed with the collector of internal revenue at Indianapolis, Indiana, amended personal income tax returns for the years 1941 through 1945, as well as delinquent returns for the years 1938, 1939 and 1940, for which years no returns had previously been filed. These returns were prepared by the accountants employed by petitioner in 1946. At the time these returns were filed petitioner paid to the collector of internal revenue the sum of $56,998.17 in payment of the *130 tax liability disclosed by these returns, including interest and penalties for the years when no returns were filed. This action of the taxpayer was entirely voluntary and occurred prior to the time that any investigation, notification or demand was made upon the taxpayer by the United States Treasury Department, Bureau of Internal Revenue, or any agent or representative of these departments. McCarthy conceded in his testimony that the amended and delinquent returns were improperly filed with the collector at Indianapolis and should have been filed at Toledo. Late in 1946, internal revenue agent Stafford Vale was assigned to examine the income tax returns of Otto and Leander, as well as the partnership returns of Frank Bomholt & Sons for the years 1938 to 1945, inclusive. In January 1947, he contacted Leander at the Celina Implement Company, Celina, Ohio, and explained that the Government wished to obtain consent waivers to extend the statute of limitations for the years 1941 and 1943 for both brothers beyond the period when the time limit ordinarily would expire. Leander stated that he was advised by their accountants not to do anything until he got in touch with them. Leander *131 then made a long distance call to their accounting firm and spoke to a representative in that office in the presence of agent Vale. At Leander's request, Vale spoke to the accounting firm's representative, explaining that he was in Celina to examine the years 1941 and 1943 and asked if it was all right to have the clients sign waivers. The party to whom Vale spoke did not identify himself by name but said that he understood what a waiver was, that it was to extend the statute of limitations and he knew of no reason why it should not be executed. Leander again spoke to the accounting firm representing him and stated at the conclusion of the telephone conversation that he would sign the waivers, that the representative said to go ahead. Leander did not ask Vale for any further explanation at that time and voluntarily signed waivers for 1941 and 1943, which he turned over to the examiner. Vale then requested Leander to notify Otto that the accounting firm had recommended that they execute the consent waivers so that it would not be necessary to go through the same process of contacting the accountant's office again. Leander called Otto on the telephone, advised him he had spoken to the *132 accountant and said that "some fellow is here with papers to sign and the accountants said it was O.K." Vale went to the St. Rosa, Ohio, store, presented the papers to Otto and they were executed. No promise was made to Otto or Leander that any leniency would be shown them with respect to setting up the tax liabilities if the waivers were signed nor was the fraud penalty discussed with Otto at that time. The Government agent, Stafford Vale, who audited the taxpayers' books, likewise found them inadequate and found that no accurate result could be arrived at from them. He also determined that the partnership profit must be reconstructed. In his reconstruction he disregarded the practice of the partnership in making sales for which they were paid by promissory notes, and he proceeded on the bank deposit theory. Vale did not follow the same procedure in arriving at gross receipts because an examination of the bank records made it appear that there was greater income, as indicated by bank deposits, than was reported on the amended returns. The bank deposits method was used rather than a percentage markup on purchases in arriving at gross receipts because the examining officer felt that *133 using actual figures rather than percentages was more accurate and that this would be a better method to follow. Vale had access to the sales slips which had been preserved among the records of the business at the St. Rosa store and made a spot check to see what value they would be to him, but decided that since they were not complete, not in good order, and did not properly reflect all sales they were not sufficient to enable him to establish a correct net income. Both of the taxpayers cooperated with the examining officer who spent approximately 30 days on the case, including work at Celina and St. Rosa and the time spent in preparing his reports for the Cleveland office. The following method was employed by the agent in computing gross receipts for each year: Deposits in the partnership accounts at the Celina and St. Henry banks were totaled, any transfers of funds between accounts that could be identified were eliminated, together with any receipts representing proceeds of loans from banks or other identifiable borrowed funds. The beginning inventory figure used in the amended returns was accepted by the examiner as correct since he was advised it was based on a physical inventory *134 taken by the taxpayers at the end of 1937 or sometime in 1938. The amount available for total disbursements was arrived at in each year by taking the opening balances of the partnership bank accounts, adding the total deposits to them and then subtracting the ending balances. Eliminations were made for transfers of funds between accounts, repayment of loans, known partners' withdrawals and operating expenses. The resulting figure was the amount available for purchases. The amounts which the agent eliminated as transfers were obtained by analysis of bank accounts. Loan repayments were ascertained by checking bank disbursements against the loan records of the various banks with which the partnership did business. Drawings of the partners for 1943 were computed from an analysis of cancelled checks. Since a partial analysis of cancelled checks for 1938 produced substantially the same figures for drawings as computed by petitioners' accountants, their figure was accepted. In his reconstruction of partnership income the examiner accepted the operating expense figures submitted by the taxpayers' accountants on the amended returns since they appeared to be substantially correct. A different *135 figure was used for 1939 but this was an inadvertent error. *
The examining agent and the taxpayers' accountant followed the same basic method in computing purchases, but their figures for 1938 and 1943 differ because the amount claimed on the amended returns did not appear to the examiner to be in line with the disbursements available for purchases in those years. Inventories for the years involved were computed by the examining officer in the following manner: "The beginning inventory for 1938 and the closing inventory for 1945 were accepted as correct and the increase between those two years was prorated on the basis of a percentage of purchases; that is, the total purchases for all years were divided into percentages for each year and the resulting annual percentages were applied to the increase in inventory. The figure resulting from the foregoing computation then was added to the opening inventory for the particular year: the total figure determined in this way represented the closing inventory." The only difference between the examiner's computation *136 of ending inventories and that used by taxpayers' accountants concerns the method of proration of the increase in inventory over the intervening years between 1938 and 1945. The same method was used by the examining officer and taxpayers' accountants in preparing their respective net worth statements, but the examining officer did not include notes receivable on hand as an asset at the opening of the period or on the closing date. It was his view that exclusion of notes receivable as partnership assets was justified from an accounting standpoint because, to set up the true financial condition of a partnership, it would have been necessary to determine the partnership liabilities of notes payable and the true amount of notes receivable. At no time during the course of the agent's examination did he have the information available from which he could have determined the exact status of the partnership liabilities as of December 31, 1937 and December 31, 1945. A comparison of the respective net worth statements for Leander prepared by the petitioner's accountant and the examining officer shows that they differ as to the opening cash on hand and the value of his partnership interest. *137 Leander claims to have had $30,000 cash on hand as of December 31, 1937, rather than $16,000 plus $250 on deposit, the amount allowed by the examining officer. The examiner shows less value than does the petitioner's accountant for the one-half partnership interest on both dates. However, both statements agree as to the value of other assets held by Leander on the opening and closing dates. Since the same method was followed in preparing net worth statements for both parties, the value assigned by the examiner to Leander's one-half partnership interest differs from that computed by the taxpayer's accountants in the same amount and for the same reason as in the respective net worth statements for Otto. Petitioners' accountants estimated Otto's living expenses at $4,000 per year and Leander's at $3,000 per year. The living expenses for each petitioner did not exceed $4.000 per year. The following schedule shows the examining officer's computation of the excess of the increase in the net worth of Otto over the income determined to have been derived during the eight-year period from the partnership, rentals and farm income: Net worth of Otto M. Bomholt as of
December 31, 1945, per examiner
$244,541.06
Less: Depreciation reserve
9,820.99
Net worth less depreciation reserve
$234,720.07
Net worth of Otto M. Bomholt as of
December 31, 1937, per examiner
69,779.00
Increase in net worth
$164,941.07
Estimated living expenses (8 years at
$5,000 per annum)
40,000.00
Total income on net worth basis
$204,941.07
Income per Supplemental RAR: Partnership - 50% interest
$168,157.74
Rental income
5,400.00
Farm income
14,000.00
Total
$187,557.74
Income not accounted for
17,383.33
Distribution to each year
$ 2,172.92
*138 The following schedule shows the examining officer's computation of the excess of the increase in the net worth of Leander during the eight-year period over the income determined as having been derived from partnership and rentals: Net worth of Leander P. Bomholt as
of December 31, 1945, per examiner
$181,234.21
Net worth as of December 31, 1937,
per examiner
44,942.17
Increase in net worth
$136,292.04
Estimated living expenses (8 years at
$5,000 per annum)
40,000.00
Divorce settlement
30,500.00
Total income on net worth basis
$206,792.04
Income per Supplemental RAR: Partnership - 50% interest
$168,157.74
Rental income
4,940.00
Total
$173,097.74
Income not accounted for
33,694.30
Distribution to each year
$ 4,211.78
The income unaccounted for in the case of each partner was prorated over the eight-year period and an equal amount was added in each year to the incomes of Otto and Leander. The $30,500 divorce settlement was included in the net worth statement of Leander because it represents an expenditure which would not otherwise be reflected in the net worth analysis. No explanation was presented to the examiner during his investigation *139 to show the source of that sum and the expenditure could not be traced through any of the bank accounts of L. P. Bomholt, nor could it be traced as having originated from the disposition of stocks, bonds, or any other assets on hand as of December 31, 1937. The examiner did not attempt to verify this item in detail because Leander told him that was the correct figure and he accepted it as a fact. No evidence was ever furnished to the examiner to establish the fact that Leander had more than $16,000 in cash on hand at the opening date. No substantiation for this claim was found by the examiner in any records presented to him by the taxpayers or in the bank accounts which he checked in the course of his work. The amended partnership returns prepared by McCarthy, one of the accountants representing petitioners, reflect a total partnership income of approximately $337,000 while the notice of deficiency reflects total partnership income of $336,000 for the years 1938 through 1945, inclusive. The larger tax liabilities of the individual partners determined in the statutory notice from those due on the amended and delinquent returns filed by petitioners result from differences in the *140 distribution of the total partnership income as between the eight years. There was no deliberate intention on the part of examining officer to place the largest amounts of taxable income in the years when tax rates were highest; this result followed naturally from the method of reconstruction employed. Neither petitioner filed any of the tax returns involved in this matter with any intent to defraud the Government and neither petitioner failed to file any returns with the intention of defrauding the Government of income tax. No part of any deficiency herein is due to fraud with intent to evade tax. Opinion BLACK, Judge: Respondent has determined that for each of the years 1938 to 1945, inclusive, petitioners are liable to the 50 per cent civil fraud penalty under the provisions of section 293 (b) of the Internal Revenue Code which is printed in the margin.[1] The determination of fraud by respondent places upon him the burden of proving fraud by clear and convincing evidence. Fraud is not negligence, however gross, but it is the intentional wrongdoing for the purpose of evading a tax believed to be owing. Mitchell v. Commissioner, 118 Fed. (2d) 308. *141 In William W. Kellett, 5 T.C. 608 we said: "What constitutes fraud is a question of fact which frequently requires a nicely balanced judgment to answer. To be considered are all of the facts and circumstances surrounding the conduct of the taxpayer's business and all the facts incident to the preparation of the alleged fraudulent return. The conclusion must be reached not on isolated bits of testimony, but on the whole record. * * *" We think that respondent has failed to meet his burden of proof. The evidence shows that negotiable promissory notes were received by the partnership for a great portion of its sales. The partnership was forced to borrow money for which it generally delivered as collateral customers' notes of twice the value of the loan. Very little cash was available for distribution *142 to petitioners until 1941 and 1942 and petitioners always lived frugally. From 1923 to 1935, petitioners were partners with their father, Frank Bomholt, and from 1935 to 1946, Leander and Otto were the sole partners in the firm of Frank Bomholt & Sons. Petitioners worked long hours for about 20 years and during this time they received little money from the partnership. The records of the business were crude and no inventory was taken after 1937 until the dissolution of the partnership was determined. Otto, who prepared the partnership returns, worked long hours in the business and was continually harassed and worried by his wife's illnesses which required much of his attention. Neither petitioner really understood what proper books of account meant and their system of keeping books was quite nearly like the original system used by their father. For the purposes of filing partnership returns Otto estimated the figures shown thereon. It is true that estimates came far from reflecting the true income of the partnership, but we are not convinced that this was done with intent of filing fraudulent returns. There is reason to believe, we think, that petitioners thought the money withdrawn *143 in later years represented earnings which had accumulated even before 1938 and some of it as early as 1923. Otto knew little more than Leander about bookkeeping and apparently Leander knew practically nothing at all. The manner in which the partnership books were kept could not produce an accurate net profit figure. Leander relied entirely on Otto's ability to make out the partnership returns and accepted his distributive share determined by Otto as a true statement of Leander's income. No individual returns were filed by petitioners for certain years because petitioners concluded that after considering their exemptions and deductions no tax was owing. The evidence of respondent which casts some doubt on our finding that no part of the deficiencies is due to fraud is respondent's exhibits of financial statements filed by the partnership with International Harvester Company and with various banks. These statements show inventory figures larger than reported in the partnership returns, but it was explained that these statements were based on estimates made only to present a "rosy picture" and these statements did not in fact form the only basis, nor even a substantial basis, for *144 the partnership credit. Otto who prepared the statements considered them mere formalities and proof of this is the fact that the statement given International Harvester on August 3, 1943, was exactly the same as the one submitted July 15, 1942. None of the statements show the partnership income. The reputation for honesty and integrity of petitioners was established by several character witnesses at the hearing; however, we think that the most striking inference of the fact that no part of the deficiencies herein is due to fraud may be found in petitioners' actions concerning the filing of amended and delinquent returns in 1946. In affecting a dissolution of the partnership, petitioners took a physical inventory (the first since 1937) to determine the value of the partnership. Petitioners thereupon realized that they had obviously earned more than had been reported to the Government and they, therefore, on their own initiative sought the advice of International Harvester as to what might be done to remedy their past errors. Officials at International Harvester advised petitioners to engage accountants to reconstruct their income and recommended a reputable accounting firm which petitioners *145 engaged. Petitioners gave their accountants a free hand to audit their books, reconstruct their incomes and file the necessary returns on the basis of their findings. On or about October 15, 1946, petitioners filed amended partnership returns and delinquent and amended individual returns for the years 1938 through 1945. These returns were filed with the collector at Indianapolis, Indiana, but admittedly should have been filed with the collector at Toledo. Otto paid $56,998.17 as additional taxes, interest and penalties; Leander paid $52,995.04 as additional taxes, interest and penalties. It is, perhaps, well at this point to call attention to the fact that the aggregate deficiencies of $78,786.69 which the Commissioner has determined against Otto for the years 1938 to 1945, inclusive, are not in addition to the $56,998.17 which Otto paid on his amended and delinquent returns. The deficiencies which aggregate $78,786.69 are based on Otto's original returns, which is, of course, the proper method. Apparently there is only about $20,000 different, exclusive of penalties in Otto's tax liability as shown by his amended and delinquent returns and as determined by the Commissioner in *146 his deficiency notice. That difference is not due to a difference in the aggregate of the income of the partnership for the several years in issue. As we have elsewhere pointed out, that aggregate as determined by respondent was approximately $336,000 and that determined by petitioners' accountants was approximately $337,000 for the several years involved. The difference in tax liability as determined by respondent in his deficiency notice and as reported by petitioners in their amended and delinquent returns is due primarily to the years in which said income fell under the two different methods which were used. These two different methods have been explained in our findings of fact. What has been said above of Otto's tax liability is also true of Leander, except as to the amounts. It is well settled that the deficiency referred to in section 293 (b) of the Internal Revenue Code is the difference between the tax liability and the amount shown on the original return. In Aaron Hirschman, 12 T.C. 1223 and Harry Sherin, 13 T.C. 221, we held that the fraud penalty was not absolved by the filing of an amended return and there is no contention *147 by petitioners that the law is otherwise; however, there must be fraud in the first instance which is not the case in the instant proceedings. A further examination of the Hirschman and Sherin cases shows that the petitioners therein filed amended returns when they were forewarned of an examination of their original returns, while in the instant proceedings there is nothing that suggests petitioners were seeking to absolve fraud, but rather petitioners' action in filing amended returns was entirely voluntary and for the sole purpose of correcting their past errors. On the whole record we think that respondent has failed to show that any part of the deficiencies was due to fraud; therefore, the Commissioner's determination of fraud penalties is not sustained and petitioners are entitled to the benefit of section 6 of the Current Tax Payment Act of 1943. Since we have held that no part of the deficiencies was due to fraud, we must decide whether the statute of limitations has barred the deficiencies for certain years herein. Petitioner Leander Bomholt assigned as error respondent's determination of a deficiency for the years 1938 and 1941 and petitioner Otto Bomholt assigned as error *148 respondent's determination of a deficiency for the year 1941. Both assignments of error allege that the statute of limitations has run as to these years. Respondent in his brief concedes that in the absence of fraud the statute of limitations has run as to Leander's 1938 return; however, we must determine whether the statute of limitations has run for the year 1941 for each petitioner. Petitioners filed individual returns for the taxable year 1941 with the collector for the 10th district of Ohio and the collector's stamps on these returns bear the date of March 15, 1942. Petitioners' gross incomes for 1941 were in excess of 25 per cent of the amount stated on these returns and, therefore, the statute of limitations is five years. Section 275 (c), Internal Revenue Code. Waivers in accordance with section 276 (b) of the Internal Revenue Code were executed on January 11, 1947, which waivers extended the period of assessment to June 30, 1948. The statutory notices of deficiency were issued March 11, 1948. Petitioners contend only that the waivers were improperly obtained. Panther Rubber Mfg. Co. v. Commissioner, 45 Fed. (2d) 314, *149 wherein a waiver was signed under duress after the period for assessment had expired, is distinguishable from the instant proceedings for here there was no duress and the period for assessment had not expired. The manner in which the waivers were obtained and the circumstances surrounding the signing of these waivers have been set out in our findings of fact. Petitioners signed these waivers on the advice of their accounting firm and we, therefore, hold that the waivers are effective and permit respondent to determine deficiencies for the year 1941. Although we have held that respondent erred in his determination of fraud, we must still determine the amount of the deficiencies. The deficiencies are largely the result of respondent's reconstruction of the partnership income for the years 1938 through 1945. It is stipulated that the books and records of the partnership did not clearly reflect the income of the partnership for these years and, therefore, respondent, in accordance with the provision of section 41 of the Internal Revenue Code, proceeded to reconstruct the income of the partnership. By examining the partnership bank accounts respondent determined *150 the gross receipts and cost of goods sold for the partnership for each year. Respondent eliminated all transfers between accounts and his arithmetic is not challenged by petitioners, but petitioners do contend that the bank deposit method used by respondent is not correct under the facts. The partnership received negotiable promissory interest bearing installment payments as payment for a substantial amount of its sales. Local bankers considered the fair market value of these notes to be equal to their face value. The bank deposit method used by respondent treats the payment on notes receivable as income in the year in which payments were received, whereas the fair market value of the notes is income to one on the cash basis in the year in which the note is received. Pinellas Ice and Cold Storage Co. v. Commissioner, 287 U.S. 462. Section 29.41-1, Regulations 111. The record indicates that petitioners did not treat the notes as income when received prior to 1938 but no issue of estoppel is raised. If petitioners failed to report the income in the proper year, respondent may not place the income in the wrong year. Cf. Clifton Mfg. Co. v. Commissioner, 137 Fed. (2d) 290. *151 Petitioners' records are, as we said before, very inadequate. An examination of petitioners' Exhibit 27, a page of the Celina store ledger for 1938 relating to notes receivable, lists customers' notes on the debit side of the page in the order received, and though these notes were generally installment notes the notations on the credit side indicate the date of final settlement only. [2] Opposite some of these notes a line is drawn through the credit side of the account, but what this means we do not know. Perhaps, it means that these notes were never collected; however, no bad debt loss during the years 1938 through 1945 has ever been claimed by the partnership. On the credit side opposite many notes is an entry "1939 B" which perhaps means that these notes were transferred to the loose-leaf book in 1939. A further examination of Exhibit 27 shows that the petitioners' total of notes receivable on January 1, 1938, is erroneous as some of the notes paid prior to 1938 were included in petitioners' total and it is also apparent that these notes being installment notes had been partially paid by 1938, but to what extent we do not know nor do we believe petitioners know for the notes *152 have long ago been destroyed and with them the partial payment record. However, again we say that we do know that some net amount of notes receivable was on the partnership books as of January 1, 1938, and the payments when received thereon should not be included in income which is the effect of respondent's method of reconstructing income. We think that petitioners have not only shown respondent's determination to be incorrect where he used the bank deposit method in the manner we have described ( Helvering v. Taylor, 293 U.S. 507) but they have also presented a method of determining the partnership income by which a proper deficiency may be determined. Petitioners used a 33 1/3 per cent markup of cost of goods sold to determine gross receipts and this method of determining income reflects the receipts of the partnership, whether sales were made for cash or whether notes receivable were accepted in payment the same as cash. Petitioners' method, however, does not take into consideration interest income as the markup of the cost of goods sold results in a gross receipts figure which only includes income *153 from sales. The evidence shows that the notes received by the partnership were seven per cent notes and it is assumed that interest was collected thereon. [3] Because the partnership records were inadequate prior to 1939, it is impossible to determine the exact amount of notes receivable and interest income received but there was some interest income. In determining how much interest income was received we "bear heavily * * * upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner, 39 Fed. (2d) 540. The following table was compiled by petitioners' accountants and shows the closing balances of customers' notes receivable for the years indicated: Year
Amount
1937
$116,921.53
1938
138,651.38
1939
9,524.84
1940
28,672.08
1941
78,049.32
1942
87,740.73
1943
40,680.65
1944
25,283.91
1945
21,719.56 Since the note register prior to 1939 does not show the net balance due on these installment notes, we have concluded the partnership's balance as of December 31, 1937, is inaccurate. This would also be true of the balance as of December 31, 1938. Beginning in 1939, the loose-leaf notes receivable ledger contained sufficient *154 information from which an accurate balance of notes receivable at the close of each year may be obtained and we, therefore, sustain petitioners' closing balances for notes receivable for the years 1939 through 1945. In determining the interest income for the year 1938, we must assume a great portion of petitioners' balance of notes receivable for 1937 and 1938 represents the face value of the notes upon which many installments had been paid, and we, therefore, conclude that the balance as of December 31, 1938, was one-fourth of the balance determined by petitioners' accountants. This would also be true of the balance on December 31, 1937. To determine the interest income for each year then, we hold that an average should be made of the opening and closing balances for each year and upon that average a rate of seven per cent should be applied and included in income for that year. The inclusion of this interest income for each of the taxable years which we have before us will, of course, have the effect of reducing in substantial part the amount of unexplained increase in petitioners' *155 net worth which will be discussed as the last issue in this opinion. Petitioners have failed, however, to prove that respondent's determinations of purchases and inventory are incorrect. Respondent allocated the inventory increase during the period to the various years by using the percentage which purchases for each year have to the total purchases for the period. This, we think, was a proper allocation of the total inventory increase. Petitioners' allocation of the inventory increase does not even conform to the method allegedly used, i.e., a straight line allocation. We, therefore, sustain respondent's determination of cost of goods sold and we hold that petitioners' method of determining gross receipts is proper for the computation of the deficiency. The parties are in agreement as to the expenses for each year with the exception of the year 1939, where, as a result of a typographical error, respondent allowed $3,099.82 more than petitioners claimed. This error should be adjusted under Rule 50. The remaining issue for our disposition is whether respondent erred in determining that petitioners had an unexplained increase in net worth between 1938 and 1945, which respondent *156 allocated as income equally over these years. It is petitioners' contention that there were no increases in net worth over the total taxable partnership net income and, therefore, respondent has erred in that respect. Petitioners and respondent have prepared net worth studies and the discrepancies in these figures are due to the following: (1) Respondent determined that Leander had only $16,250 cash on hand on December 31, 1937, whereas petitioner determined $29,750 cash on hand; (2) respondent estimated living expenses at $5,000 per year for each petitioner, whereas petitioner Leander determined $3,000 as annual living expenses and petitioner Otto determined $4,000 as annual living expenses; and (3) respondent determined the partnership net worth without including notes receivable, whereas petitioners determined notes receivable as of December 31, 1937, to be $116,921.53. Leander has failed to prove that he had any amount of cash in excess of $16,250 as of December 31, 1937. We believe that respondent's determination for living expenses of $5,000 per year for each petitioner was excessive. On the basis of all the evidence we conclude that each petitioner's living expenses did not *157 exceed $4,000 per year. As to the determination of the net worth of the partnership on December 31, 1937, we are constrained to approve respondent's determination which takes no account of the value of notes receivable as of that date. Although in deciding the proper partnership income for 1938 through 1945, we said that there were some notes receivable on hand, we also said that it was impossible to determine their value. Petitioners were unable to determine the value of these notes, and in addition petitioners' balance sheet of December 31, 1937, for the partnership lists liabilities at zero while at the same time the evidence shows that there was some partnership indebtedness as of this date. Petitioners having failed to prove, quite likely because petitioners were unable to, the true net worth of the partnership as of December 31, 1937, including notes receivable and liabilities, we accept respondent's determination of net worth as of this date believing that the balance due on notes receivable is cancelled out by unknown liabilities. The evidence indicates, however, that the net worth of the partnership as of December 31, 1945, determined by petitioners' accountants is correct *158 and, therefore, in determining the increase in net worth for each petitioner, respondent's opening determination of the partnership net worth is sustained and petitioners' closing determination of partnership net worth is sustained. The unexplained increase in net worth from December 31, 1937 to December 31, 1945, must be recomputed under Rule 50 and the unexplained increase after taking into consideration the interest income which we have held should be added to income for each year and making proper adjustments therefor is properly apportionable to the eight years, 1938 through 1945. In his determination of the deficiencies the Commissioner has included certain delinquency penalties and we do not understand that petitioners contest the imposition of delinquency penalties and there is, therefore, no issue between the parties on that score. The amounts of such delinquency penalties will, of course, be redetermined in a recomputation under Rule 50. Decisions will be entered under Rule 50. Footnotes
*. It is apparent that respondent inadvertently used the net profit figure of petitioners rather than the expense figure.↩
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).↩
2. For example, payment in full, renewal note, repossession.↩
3. One page of the loose-leaf 'edger for notes receivable shows that interest was collected.↩